## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Mabel Ulibarri, an individual, | CASE NO. |
| Plaintiff, | |
| vs. | |
| WYETH, INC. (f/k/a AMERICAN HOME PRODUCTS; WYETH PHARMACEUTICALS (f/k/a WYETH-AYERST PHARMACEUTICALS); PHARMACIA & UPJOHN COMPANY, LLC; PHARMACIA & UPJOHN LLC; PHARMACIA CORPORATION; PFIZER, INC.; and DOES 1 through 100, Inclusive, | **JURY TRIAL REQUESTED** |
| Defendants. | |

### COMPLAINT FOR DAMAGES

Plaintiff Mabel Ulibarri (hereinafter referred to as "Plaintiff") hereby alleges as follows:

### INTRODUCTION

1.      Plaintiff ingested hormone replacement therapy drugs (hereinafter referred to as "HRT" drugs), after entering menopause. As more fully elaborated below, Plaintiff was lulled into beginning and continuing the use of HRT drugs by Defendants' false assertions that these drugs were safe, and in fact, even good for women. As a result of her use of these HRT drugs, Plaintiff has been diagnosed with breast cancer.

2.      Defendant Wyeth Inc. and its many unincorporated divisions, are the creators, manufacturers, designers, marketers, advertisers and promoters of HRT drugs, including but not limited to Prempro, Premarin, Provera and Cycrin.

3.      At all times relevant hereto, Defendant Pharmacia & Upjohn Company, LLC, was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing,

promoting, and/or selling, either directly or indirectly, through third parties or related entities, hormone therapy drugs including Provera and/or MPA.

4.     At all times relevant hereto, Defendant Pharmacia & Upjohn, LLC was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including the drug Provera, generic estrogen (including but not limited to FemHrt and Vagifem) and MPA and combination products (including Activella) for ultimate sale and/or use in the United States of America.

5.     Defendant Pharmacia Corporation is a wholly owned subsidiary of Pfizer, Inc., and at all times relevant hereto, was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting and/or selling, either directly or indirectly, through third parties or related entities, hormone therapy drugs, including Provera and/or MPA.

6.     At all times relevant hereto, Defendant Pfizer, Inc. was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting and/or selling, either directly or indirectly, through third parties or related entities, HRT drugs including, but not limited to, Provera and/or MPA.

7.     As alleged more fully below these HRT drugs were defective, and Defendants failed to warn Plaintiff that these drugs posed serious risks of grave injury, including breast cancer. Defendants over-promoted their products for long term usage and for off label uses. In 2002, results from a long-term clinical trial of the combination HRT *Prempro* found it increased the patient's risk of invasive breast cancer by 26 percent.

8.     Plaintiff seeks individual damages including lost wages, pain and suffering and medical expenses.

## THE PARTIES

9.      Plaintiff Mabel Ulibarri is a resident of Elko, Nevada.  Plaintiff began taking, Provera, an HRT drug made by Defendants in 1982 when she was experiencing menopause. Plaintiff continued to take Defendants' HRT drugs until 2001, when she was diagnosed with breast cancer in both of her breasts.  The noninvasive papillary carcinoma on her left breast was diagnosed to be estrogen positive.

10.     Defendant Wyeth, Inc., is a Delaware Corporation with its headquarters and principal place of business located at 5 Giralda Farms, Madison, New Jersey.  At all relevant times herein mentioned, Wyeth, Inc., was in the business of testing, manufacturing, labeling, marketing, distributing, promoting, advertising and selling each of the HRT drugs described herein to patients and their doctors.

11.     Wyeth, Inc. includes any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers and organizational units of any kind, their predecessors, successors and assigns and their present officers, directors, employees, agents, representatives and other persons acting on their behalf.

12.     Wyeth Pharmaceuticals is, and at all times material to this action was, a corporation organized and existing under the laws of the State of Pennsylvania.  Wyeth Pharmaceuticals conducted business, operated under the name and was formerly known as Wyeth-Ayerst Pharmaceuticals at all material times before March 11, 2002, at which time it changed its name to Wyeth Pharmaceuticals.  Wyeth Pharmaceuticals is, and at all times material to this action was, authorized to do business, and was engaged in substantial commerce and business under the laws of the State of California, County of Los Angeles, with its corporate headquarters and principal place of business at 555 East Lancaster Avenue, St. Davids, Pennsylvania 19087.

13.     Defendant Pharmacia & Upjohn Company LLC is a limited liability company whose sole member is Pharmacia & Upjohn LLC, which is a limited liability company whose sole member is Pharmacia Corporation, which is a subsidiary of Pfizer, Inc.  Pharmacia & Upjohn Company LLC is a Delaware company with its principal place of business in New York.  Pharmacia & Upjohn

3

Company, LLC, at all relevant times, was licenced to do business in all states of the United States of America. At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including the drug Provera, generic estrogen (including but not limited to FemHrt and Vagifem), and generic medroxyprogesterone acetate (MPA) and combination products (including Activella) for ultimate sale and/or use in the United States of America.

14.     Defendant Pharmacia & Upjohn, LLC is a limited liability company whose sole member is Pharmacia Corporation, which is a subsidiary of Pfizer, Inc. Pharmacia & Upjohn, LLC is the sole member of the limited liability company Pharmacia & Upjohn Company, LLC. Pharmacia & Upjohn, LLC is a Delaware company with its principal place of business in New York. Pharmacia & Upjohn, LLC, at all relevant times, was licensed to do business in all states of the United States of America. At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including the drug Provera, generic estrogen (including but not limited to FemHrt and Vagifem), and generic medroxyprogesterone acetate (MPA) and combination products (including Activella) for ultimate sale and/or use in the United States of America.

15.     Defendant Pharmacia Corporation is a wholly owned subsidiary of Pfizer, Inc., and is the sole member of the limited liability company Pharmacia & Upjohn, LLC, which is the sole member of the limited liability company Pharmacia & Upjohn Company, LL. Pharmacia Corporation is a Delaware corporation with its principal place of business in the state of New Jersey. At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including the drug Provera, generic estrogen (including but not limited to FemHrt and Vagifem), and generic medroxyprogesterone acetate (MPA) and combination products (including Activella) for ultimate sale and/or use in the United States of America.

4

16.     Defendant Pfizer, Inc. is a Delaware corporation with its principal place of business in New York. Pfizer, Inc. is licensed to do business in all states of the United States of America. Upon information and belief, Pfizer, Inc. has merged with Pharmacia & Upjohn Company, LLC, Pharmacia & Upjohn LLC and Pharmacia Corporation and, as a result, Pfizer, Inc. is legally and factually responsible for all obligations, debts and liabilities of these three entities. More specifically, Pfizer, Inc. wholly owns Pharmacia Corporation, which is the sole member of the limited liability company Pharmacia & Upjohn LLC, which is hte sole member of the limited liability company Pharmacia & Upjohn Company LLC. The term "Pfizer" used herein refers to Pfizer, Inc. and each of these related companies. At all relevant times herein, Pfizer, Inc. was engaged in the business of designing, manufacturing, producing, testing, inspecting, mixing, labeling, marketing, advertising, selling, promoting and/or distributing HRT drugs, including the drug Provera, generic estrogen (including but not limited to Fem-Hrt and Vagifem), and generic medroxyprogesterone acetate (MPA) and combination products (including Activelle) for ultimate sale and/or use in the United States of America.

17.     Plaintiff is informed and believes, and thereon alleges, that in committing the acts alleged herein, each and every Defendant was the managing agent, agent, representative and/or employee of each and every other Defendant and was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification and authorization of each and every remaining defendant and its directors, officers and/or managing agent.

18.     All of the Defendants were acting together and in concert, entering into agreements with each other, and working as the principal, agent, employee of the other remaining Defendants and that each Defendant was aware of the acts of the others and consented to and ratified such acts.

19.     Plaintiff is further informed and believes, and based thereon allege, that a unity of interest in ownership existed between Wyeth, Inc. f/k/a/ American Home Products and Wyeth Pharmaceuticals f/k/a/ Wyeth-Ayerst Pharmaceuticals, and between Pfizer and Pharmacia & Upjohn Company LLC, Pharmacia & Upjohn LLC and Pharmacia Corporation, such that any individuality

5

and separateness that purportedly existed ceased and each Defendant became the alter ego of the others. By and through this unity each Defendant asserted control over the other. Defendants conducted business jointly as co-owners, joint venturers or partners, and they have shared and inter-mingled joint management and capital and have dealt with Plaintiff jointly. Defendants share the same managers and officers, forms, offices, employees, policy and procedure manuals, and operating manuals.

20.     At all times material to this action, Defendants, and each of them, designed, developed, tested, redeveloped, studied, investigated, manufactured, packaged, distributed, placed into the stream of commerce, described, advertised, promoted and purported to inform users regarding the risks pertaining to, and assuaged concerns about their pharmaceutical HRT drugs.

## JURISDICTION AND VENUE

21.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000 exclusive of interests and costs, and because this is an action brought by Plaintiff who is a citizen of Nevada, against Defendants who are citizens of Pennsylvania and New Jersey.

22.     Venue is proper in the Eastern District of Pennsylvania because the Defendants reside in this district.

6

## GENERAL ALLEGATIONS

23.     Plaintiff brings this action to recover damages for personal injuries against the Wyeth Defendants, which tested, manufactured, marketed, labeled, distributed, promoted, and sold Premarin, Prempro, Premphase, Provera,  and medroxyprogesterone acetate (a synthetic equivalent of the hormone progestin).

24.     Among the most prescribed hormone therapy drugs for post-menopausal women is the Wyeth Defendants' product, Prempro, which is also known by its pharmaceutical name, conjugated equine estrogens/medroxyprogesterone acetate (progestin). Prempro is considered a combination hormone therapy because it contains a combination of two hormones, estrogen and progestin.  The Wyeth defendants' product, Premphase, is very similar to Prempro, containing a combination of estrogen and progestin. However, instead of providing estrogen and progestin every day, as the Prempro tablet does, Premphase provides estrogen every day while the progestin is added to the pill only for the last two weeks of the menstrual cycle. This is done so that Premphase hormone regime resembles the normal menstrual cycle.

25.     Prempro has been prescribed to women, including Plaintiff in this action, as a hormone replacement therapy for postmenopausal women. Prempro is prescribed to women with an intact uterus to control menopausal symptoms including hot flashes, night sweats, vaginal atrophy and osteoporosis. Approximately six (6) million women in the United States - 85% of all women taking hormone replacement therapy - take Prempro each year. Wyeth's Prempro sales exceeded $2 billion in 2002.

26.     Estrogen therapy refers to use of estrogen alone for hormone therapy.  Among the most prescribed brands of estrogen is the Wyeth product, Premarin, which is also known by its pharmaceutical name, conjugated equine estrogens. In addition to manufacturing the hormone therapy drugs, Premarin, Premarin, and Premphase, the Wyeth Defendants manufactured and distributed another hormone drug, medroxyprogesterone acetate, which is a synthetic progestin that when taken

7

concurrently with Prelnarin constitutes a form of combination hormone therapy that is **pharmaceutically equivalent to the Prempro tablet.**

27.     Prempro was approved for sale in the United States in December 1994 for use as a combination estrogen and progestin hormone replacement therapy (HRT) containing 0.625 mg Premarin (conjugated estrogens) and 2.5 mg medroxyprogesterone acetate blister packaged together for concomitant use. Prempro was approved and prescribed as a continuous HRT regime. Prempro was approved in 1997 for sale as a single tablet. In 1998, Prempro was approved at an increased progestin dose, in a single tablet containing 0.625 mg Premarin (conjugated estrogens) and 5 mg medroxyprogesterone acetate.

28.     The National Heart, Lung, and Blood Institute (NHLBI) of the National Institutes of Health (NIH) stopped a major clinical trial it sponsored with the Women's Health Initiative when the evidence showed Prempro dangerously increased menopausal women's risks of invasive breast cancer, heart attacks, strokes, cardiovascular disease and venous thromboembolism.

29.     The estrogen plus progestin trials initially ran from 1993 to 1998 at clinics across the county, but the trials were extended to end in 2005. Defendants' Prempro was the only estrogen plus progestin pharmaceutical used in the trial. The trials investigated the effect of estrogen plus progestin on the prevention of heart disease, hip fractures and looked for changes in the risk of breast and colon cancers.

30.     The trials were the most comprehensive study of women's health undertaken in the United States. The trials studied 16,608 postmenopausal women ages 50 to 79 years with an intact uterus. Women participating in the trial were given a daily dose of 0.625 mg conjugated estrogens and 2.5 mg medroxyprogesterone acetate or a placebo. Researchers conducted a standardized interview of the participants every six months to collect information and document their symptoms. The study protocol required annual mammograms and clinical breast examinations. Researchers collected electrocardiograms at baseline and at follow-up years 3 and 6. The data were assimilated through a network of clinics overseen by a Clinical Coordinating Center.

31.    Researchers established a Data and Safety Monitoring Board (DSMB) to analyze the collected information. In 2000 and 2001, the DSMB recommended that investigators inform participants that the trials observed a small increase in the incidence of heart attacks, strokes, and blood clots in women taking the hormones. The DSMB continued the test because the number of symptomatic women was small and did not cross the boundary established to ensure participant safety and because the balance of risks and benefits was uncertain.

32.    On May 31, 2002, the DSMB convened again and issued the shocking recommendation to stop the trial three years before it was scheduled to end. The trials found Prempro caused a *26 percent increase in breast cancer*. The trials also found Prempro caused increased instances of gall bladder disease including a *41 percent increase in strokes*, a *29 percent increase in heart attacks, a doubling of rates of venous thromboembolism* (blood clots) and a *22 percent increase in total cardiovascular disease.*

33.    Based on these findings, the NHLBI stopped the trial on May 31, 2002, and the researchers advised the participants to stop taking Prempro.

### Wyeth's Over-Promotion of HRT

34.    The WHI study was completely different from the prior ideas that defendants HRT drugs were good for women's bodies. Wyeth's constant barrage of articles, videos, and medical reports made women feel like HRT therapy was the *only* way to stay young and healthy during menopause. In fact, the Wyeth Defendants deceived American women into believing that their natural aging process was an enemy. For this reason women not only started HRT, but stayed on it long after menopause.

35.    Hormone "Replacement" Therapy or "HRT" most commonly refers to the combination of both conjugated estrogens (estrogen) and progesterone (progestin). Estrogen used alone is sometimes known as Estrogen "Replacement" therapy, "ET," estrogen alone, or estrogen unopposed. HRT and ET are prescription therapies provided to women during and after menopause. HRT is prescribed to women who have made the natural transition to menopause through the aging

9

process. ET is prescribed to women who have had a surgical menopause through hysterectomy.[1]  In general, hormone therapy is an umbrella term that is used to refer to either the use of combination hormone therapy (that is, estrogen and progesterone) or the use of estrogen alone.

36.     In the average female reproductive life, the period of menopause can occur from age 51 until death. During menopause, a woman's estrogen level drops sharply. Hot flashes—which for some women are just a vague feeling of warmth, for others, the skin suddenly flushes and beads with sweat, while the pulse races—are a very common symptom of menopause.  When estrogen levels drop off, so does calcium in the skeleton.  As a result, the risk of osteoporosis and spine, hip, and other fractures goes up.

37.     Menopause is a major issue in the lives of millions of women.  Natural menopause comes at a time when women are relatively young, usually between 46 and 62, when most American women live to an average age of 80.  As a result, the consequences of menopause are felt for years after the menopause begins.

38.     Menopause has been described in scientific literature since the late 1800s.  By the turn of the 20th century, the search for an aid to maintaining the youth, health, sex, and vitality of women was widely pursued. The increasing awareness of the effects of menopause made a drug to "cure" menopause a blockbuster drug waiting to happen. In 1942, Ayerst, the predecessor to the Wyeth Defendants, received approval for the patent of that blockbuster, Premarin, a mix of estrogens extracted from the urine of pregnant mares.

39.     The same year the predecessor to the Wyeth Defendants patented Premarin it also received FDA approval.  Premarin was marketed early on as "Replacement" therapy because it "replaced" the estrogens that began to disappear from a woman's body.

40.     The Wyeth Defendants have vigorously promoted their hormone therapy products-using marketing efforts directed to physicians and programs intended to reach consumers directly

---

[1] Estrogen therapy is prescribed to women who have any one of three types of hysterectomy: *subtotal* (where only the uterus is removed and the ovaries and cervix remain intact); *total* (where both the uterus and cervix are removed but the ovaries remain); or *total plus ooperectomy* (where at least one ovary is removed along with the uterus and cervix).

(i.e., "direct-to-consumer" or "DTC" marketing). The intention of Wyeth's marketing efforts was to create a lifelong demand for its hormone therapy drugs and a willingness by physicians to prescribed these drugs to their post-menopausal patients.

41.     There are an estimated 50 million post-menopausal women in the United States. Menopause is a natural condition and process and not a disease. In July 2002, approximately 38% of postmenopausal women in the United States used estrogen or hormone replacement therapy, including approximately six million American women who were taking Prempro.

42.     The Wyeth Defendants' DTC efforts have included overt advertising pieces, such as print advertisements, videotapes, and brochures directed to consumers, as well as "product placement" efforts in which hormone therapy drugs are favorably positioned in entertainment vehicles or favorably described in the popular press by hired spokespersons. In 1999, the Wyeth Defendants spend $34.7 million on DTC advertising for Prempro, alone. In 2000, Wyeth spent $37.4 million on Prempro DTC advertising.

43.     Wyeth's hormone therapy drugs, Prempro and Premarin, were designed and have been approved by the FDA only to relieve menopausal symptoms, such as hot flashes and vaginal atrophy, and osteoporosis. The Wyeth Defendants, however, have long touted additional benefits for their hormone therapy drugs, beyond these FDA-approved uses.

44.     Wyeth marketing hormone therapy marketing efforts have a long history. In 1962, a Brooklyn, New York, gynecologist, Dr. Robert Wilson, wrote an article, also appearing in the *Journal* of *the American Medical Association* (*JAMA*), that claimed taking estrogen during menopause *reduces* breast and genital cancers. Then, in 1966, Dr. Wilson wrote his bestseller entitled *Feminine Forever*. In it, Dr. Wilson recommended estrogen as the "cure" for "the tragedy of menopause." He argued that women who use the drugs "will be much more pleasant to live with and will not become dull and unattractive." In writing about the menopause condition, which he termed the "deficiency disease," Dr. Wilson wrote that "aside from keeping a woman sexually attractive and potent . . . estrogen preserves the strength of her bones, the glow of her skin, the gloss of her hair. . . Estrogen makes women adaptable, even-tempered, and generally easy to live with." Dr. Wilson

11

asserted that estrogen *prevents* breast and genital cancers, such as endometrial cancer (i.e., cancer of the uterine lining).

45.     The FDA later said that Dr. Wilson's recommendations went beyond the approved use for hormone therapy and that it would no longer accept his data. However, soon after the publication of Dr. Wilson's book, the Wyeth Defendants' sales force began to distribute the book to physicians throughout the country. The Wyeth Defendants poured thousands of dollars into Dr. Wilson's research. The Wyeth Defendants ran advertisements in medical journals that read: "Treat her with Premarin. Keep her on Premarin." Following Dr. Wilson's publications, sales of Premarin quadrupled. By the mid-70s more than 30 million prescriptions for Premarin were being written every year, eventually making it the fifth most frequently prescribed drug in the United States.

46.     In 1973, an article appearing in *Harper's Bazaar* claimed, "There doesn't seem to be a sexy thing estrogen can't and won't do to keep you flirtatiously feminine for the rest of your days. . . . a real package deal that spruces up your vagina. . . Prevalent medical opinion is that the safety and benefits of ERT have been convincingly demonstrated."

47.     In a print advertisement that the Wyeth Defendants published in the October 13, 1975, edition of *JAMA*, the Wyeth Defendants claimed that "tension, irritability, headaches, undue fatigue, depression and insomnia," when caused by declining menopausal estrogen levels, may be relieved with Premarin. Additionally, at the top of the advertisement, in large print, Wyeth advised doctors, "Almost any tranquilizer might calm her down . . . but at her age, estrogen may be what she really needs."

48.     But, by the mid-70s it also became evident that women using estrogen began to show a significant increase of endometrial cancer. In 1976, the first study showing a link between menopausal estrogen and endometrial cancer appeared in the New England Journal of Medicine. Consequently, physicians stopped prescribing Premarin for women, except for those who bad hysterectomies and therefore were not at risk for endometrial cancer. Estrogen sales plummeted and by 1979, the only approved use of estrogen was for treatment of hot flashes and vaginal dryness. The Wyeth Defendants therefore had to come up with a new justification for menopausal women

12

without hysterectomies to continue taking Premarin. In 1980, an article by Dr. Don Gambrell that appeared in the journal, *Obstetrics and Gynecology,* reported that adding progestin to estrogen led to a *decline* in endometrial cancer. This progestin (i.e., synthetic progesterone or medroxyprogesterone acetate) was therefore added to the estrogen hormone therapy regimen to protect the uterus.

49.     The Wyeth Defendants have manufactured, marketed, and distributed medroxyprogesterone acetate for use in combination with Premarin under trademarked brand names such as Provera and Cycrin and as generic equivalents.

50.     In 1985, the Wyeth Defendants developed another spin on the marketing of hormone therapy drugs, claiming that the drugs could help prevent bone loss. The Wyeth Defendants hired a public relations firm to create public awareness of osteoporosis and learned that 77% of women never heard of osteoporosis. As a result, the Wyeth Defendants' public relations campaign sought to tell women that osteoporosis is a devastating disease and that its estrogen drug, Premarin, could treat it. Soon, their public relations campaign created support for a National Osteoporosis Week and eventually, a National Osteoporosis Foundation (to which the Wyeth Defendants contributed).

51.     The Wyeth Defendants also sought to claim that hormone therapy drugs, such as Premarin, could prevent cardiovascular disease. By claiming—as the Wyeth defendants did—that hormone therapy drugs prevent the biggest killer of all, cardiovascular disease, Premarin could be promoted as recommended treatment for women. In 1985, the Nurses Health Study was released and the Wyeth Defendants asserted that the study proved this very assertion—hormone therapy prevented cardiovascular disease.

52.     The Nurses Health Study, which was based on questionnaires of almost 122,000 female nurses, including 32,300 post-menopausal women, suggested that women using hormone therapy were at a lesser risk of developing coronary heart disease. Soon enough, researchers were producing many studies championing the use of hormone therapy to prevent heart disease and bone loss, without the risk of cancer, stroke or blood clots. As a result of the Wyeth Defendants efforts to generate and promote research that supported the conclusion that hormone

13

therapy protected women's cardiovascular system, between 1990 and 1995 Premarin became the most frequently dispensed prescription drug in the United States.

53.     The Wyeth Defendants' hormone therapy promotion and marketing efforts overstated the conclusions of the Nurses Study. Researchers were still uncertain of the final assessment of the benefits and risks of hormone therapy. For instance, the Nurses Study was significant in size, but it was not a randomized study where participant results are compared between drug users and participants using placebo, the type of study considered the gold standard in medical research. Moreover, the participants in The Nurses' Study were educated and compliant "patients" - actually nurses - who were more keenly aware of their health conditions and at a lower risk for heart disease regardless of hormone therapy.

54.     In addition to Wyeth's research efforts to support its overreaching claims to hormone therapy drugs, the drug maker's marketing juggernaut sailed forward, impeded by the lack of scientific support for its claims. For instance, in March of 1998, Wyeth offered a free magazine subscription (to "Seasons" magazine) to women taking its hormone therapy drugs in exchange for submitting personal information to Wyeth on a postcard or by calling a toll-free phone number. Beginning in early 1999, Wyeth also distributed a brochure to women through the waiting rooms of physicians' offices that claimed, "Menopause isn't gone in a flash—its debilitating consequences can affect the rest of your life." The promotional brochure also directed women to "Take a few minutes to think about the rest of your life" and listed a number of conditions which neither Prempro nor Premarin had been approved by the FDA to treat, including Alzheimer's disease, vision problems, tooth loss, heart disease, and colon cancer.

55.     In a magazine advertisement featuring model Lauren Hutton, Wyeth made a rash of similar claims, suggesting that its hormone therapy drugs were appropriate for treating or preventing, among other things, memory loss, colon cancer, and age-related vision loss. In the March 19, 2000, edition of *Parade Magazine*, Wyeth spokesperson Lauren Hutton (who was not identified as a Wyeth spokesperson) was asked what she did to look good and feel fit and she answered: "[M]y

number one secret is estrogen. It's good for your moods, it's good for your skin. If I had to choose between all my creams and makeup for feeling and looking good, I'd take the estrogen."

56. A cornerstone of the marketing Wyeth program was promotion of hormone therapy for long-term use of indefinite duration. Specifically, *JAMA* reported that:

> In 2000, 46 million prescriptions were written for Premarin (conjugated estrogens), making it the second most frequently prescribed medication in the United States and accounting for more that $1 billion in sales, and 22.3 million prescriptions were written for Prempro (conjugated estrogens plus medroxyprogesterone acetate). While U.S. Food and Drug Administration-approved indications for hormone therapy include relief of menopausal symptoms and prevention of osteoporosis, long-term use has been in vogue to prevent a range of chronic conditions, especially heart disease. (Emphasis added)

57. In or around 1993, Wyeth distributed a videotape to consumers entitled, "What every woman should know about estrogen." This videotape claimed to be a "seminar for women" and depicted a female doctor advising women about menopause and hormone therapy. Wyeth's video "seminar" warned of a wide variety of illnesses and ailments purportedly associated with menopause. Among other things, Wyeth represented that estrogen loss causes bones to become "brittle," skin to become "dryer," and sexual intercourse to become "painful and irritating." While Wyeth's video "seminar" was exhaustive in its warnings about menopause, it glossed over the dangers and risks associated with hormone therapy.

58. In its "What every woman should know about estrogen" video seminar, Wyeth also represented to women that estrogen provided "long term health protection" and should be continued indefinitely, even after short term menopausal symptoms, such as hot flashes, had subsided. When a purported consumer inquired how long Premarin should be taken, Wyeth's doctor-spokesperson responded anywhere from five to ten years in order to get protection from long term problems." And, with regard to breast cancer risks, Wyeth represented to women, through its video "seminar" that the benefits of taking estrogen "far outweigh[ed]" the risks for women unless they faced a particularly high risk of breast cancer.

59. Faced with the threat of a shrinking market for Premarin because of the end of its patent protection in 1995, the Wyeth Defendants began to develop a combination therapy pill that

would combine its super pill, Premarin, with progestin. In 1995, the Wyeth Defendants introduced Prempro, one of the first estrogen-progestin hormone therapy pills approved by the FDA.

60.     Soon after introduction of Prempro, the Wyeth Defendants began funding a four year heart disease prevention trial, called HERS: Heart and Estrogen/Progestin Replacement Study. The Wyeth Defendants had high hopes that HERS would show that hormone therapy prevents heart disease in high-risk women and that, as a result, Prempro would become an FDA-approved drug for heart disease. But in 1998, the HERS investigators reported that hormone therapy did not reduce the rate of coronary heart disease events in women with heart disease. The Wyeth defendants' hopes were left to a very important study underway known as the WHI study or Women's Health Initiative Study.

61.     While the Wyeth Defendants waited for the WHI study researchers to collect their data and reach their conclusions, the drug maker's overzealous hormone therapy marketing effort continued. At least until mid-2002, the Wyeth Defendants distributed a hormone therapy promotional brochure targeted for women consumers. Wyeth emblazoned across the front cover of its brochure the words "Starting your Hormone Replacement Therapy (HRT)." At the bottom of the cover and at the bottom of nine of its seventeen pages of text, the following words appear: "Say yes to PREMPRO." The brochure contains testimonial statements from women taking Prempro, such as, "I wanted an HRT that was established, time tested, and had a successful track record. I'm delighted with PREMPRO" and "With PREMPRO, I know I've taken action to protect my health—and that's truly empowering." The unbalanced nature of Wyeth's marketing efforts is typified by the inadequate warnings contained in the "Side Effects" section of Wyeth's "Say yes to PREMPRO" brochure. In the section, the Wyeth Defendants warn about uterine cancer (associated with estrogen-only therapy), worsening diabetes, nausea, abdominal pain, irregular bleeding, headache, hair loss, and breast tenderness.

62.     The 2001 Annual Report of the Wyeth Defendants contains a similarly testimonial statement from a Philadelphia woman: "I started taking Premarin after a hysterectomy, and it made

16

an immediate difference in getting me back to normal. Now, *more than 15 years later,* I continue to lead an active life." (Emphasis added.)

63.     This pattern of advertising HRT as a lifelong beneficial treatment caused women and their doctors, like the Plaintiff herein, to look to HRT to solve an array of medical problems that the drugs were never designed for.  As the WHI study showed, the risks that came along with these drugs were never explained to women and their doctors.

64.     Because of the importance of the report from the WHI investigators on the estrogen plus progestin study, the study was released early to the public on July 9, 2002, as an expedited article on the *JAMA* Web site.  In commenting on the studies findings, NHLBI Director, Dr. Claude Lenfant, was unequivocal in his own conclusions:

> The cardiovascular and cancer risks of estrogen plus progestin outweigh any benefits—and a 26 percent increase in breast cancer risk is too high a price to pay, even if there were a heart benefit. Similarly, the risks outweigh the benefits of fewer hip fractures.

### The Aftermath of the WHI and NCI Studies

65.     Commenting on the WHI study, Dr. Leslie Ford, associate director for clinical research at the NCI's Division of Cancer Prevention, re-emphasized the risk of hormone therapy to patients:

> The reduction in colorectal cancer risk in the WHI is intriguing, but the balance of harm versus benefit does not justify any woman beginning or continuing to take estrogen plus progestin for this purpose.

66.     Dr. Isaac Schiff of Massachusetts General Hospital also commented on the WHI study, noting that "Quality of life is very, very important. . . . From a heart and breast cancer point of view, the drug should be outlawed.  But for hot flashes, there's nothing better."

67.     Since the WHI and NCI studies were published, additional research has found more support for the unsafe and dangerous adverse effects of hormone therapy.  A study on hormone therapy and breast carcinoma risk in Hispanic and non-Hispanic women, reported on September 1,

17

2002, in the journal Cancer, found that Hispanic post-menopausal women have significantly increased breast cancer risk after long-term hormone therapy.

68.     On October 23, 2002, the United Kingdom's Medical Research Council announced that it had ended a clinical study of the risks and benefits of long-term use of hormone therapy for "scientific and practical reasons." 5,700 women were enrolled in the study known as the Women's International Study of Long Duration Oestrogen after Menopause or "WISDOM." The study was to include 22,000 women. Following the WHI study, however, the WISDOM study was canceled. The Medical Research Council concluded that "There is strong evidence that taking hormone therapy long term increases the risks of some diseases such as breast cancer and decreases the risks of others such as osteoporosis."

69.     Because of the significance of its findings, on March 17, 2003, the New England Journal of Medicine (NEJM) released a follow-up WHI study two-months in advance of its May 8th publication date. The follow-up study reported that hormone therapy failed to improve the quality of life for menopausal women.

70.     The Quality of Life study which examined the same pool of 16,000 women as the July 9, 2002 WHI study, found that hormone therapy drugs do not do the very thing many women took them for in the first place—that is, to make them feel happier and healthier after menopause. A comparison of women who took hormone therapy to women given a placebo showed those women taking hormones did not report sleeping better or feeling better. The hormone therapy group also did not report less depression or more sexual satisfaction than the placebo group.

71.     According to the study's lead author, Dr. Jennifer Hays: "It's just not something that's going to make most women feel better. Even if it reduces your symptoms, that's not going to translate into a meaningful effect on a quality of life." Dr. Deborah Grady of the University of California, San Francisco, in an accompanying commentary in the same issue of the NEJM said that: "There is no role for hormone therapy in the treatment of women without menopausal symptoms" and that women who are not experiencing debilitating menopausal symptoms should not take

hormone therapy. She stated that those women who do continue with hormone therapy should take the lowest possible dose for the shortest possible time.

72.     On May 21, 2003, JAMA published another study analyzing the efficacy of estrogen plus progestin therapy (e.g., Prempro) for prevention of bone loss in elderly women. The study involved 373 women ages 65 to 90 that had either thinning bones or full-blown osteoporosis and took one of four treatments for three years: (i) combination hormone therapy alone, (ii) a bone-building drug, alendronate (which is sold under the brand name, Fosamax), (iii) combination hormone therapy with Fosamax, or (iv) a placebo.

73.     While the study found that the combination of hormone therapy and Fosamax was effective at treatment and prevention of post-menopausal osteoporosis; it also concluded that Fosamax alone was more effective than combination hormone therapy alone. After three years, hip bone density had increased nearly 6 percent in women on hormone therapy with Fosamax, 4 percent in those on Fosamax alone, and 3 percent in the hormones-only group.

74.     Dr. Jennifer Hays, a WHI researcher and lead author of the May 8, 2003, JAMA study on hormone therapy and quality of life, said that the findings of the bone-loss study are not convincing enough to recommend hormone therapy for osteoporosis prevention even in older women, especially because the study showed that the bone-enhancing benefits from estrogen come only after long-term use which also carries the highest risk of breast cancer or heart disease.

75.     On June 25, 2003, JAMA published still another study analyzing the data from the Women's Health Initiative, which found that in addition to stimulating the growth of breast cancer, combination hormone therapy makes breast tumors harder to detect, leading to dangerous delays in diagnosis. The report found that breast abnormalities can develop soon after a woman starts taking hormone therapy. Consequently, the study's findings raise questions about the safety of even short-term hormone use. In the same June 25, 2003 issue that reported this study, JAMA also published an editorial by Dr. Peter H. Gann, a cancer epidemiologist at Northwestern University, who stated that this study represents "further compelling evidence against the use of combination estrogen plus progestin hormone therapy."

19

76.    The connection between hormone therapy usage and breast cancer found in the WHI studies were confirmed by a similar study conducted in the United Kingdom. The August 9, 2003 issue of *Lancet,* reported on the conclusions reached by *The Million Women Study*—a major research effort funded by Cancer Research UK—confirming that current and recent use of hormone therapy increases a woman's chance of developing breast cancer and that the risk goes up with duration of use. Scientists at the Cancer Research UK analyzed data from over one million women between the ages of 50 and 64. Researchers found that post-menopausal women using combination hormone therapy were twice as likely to develop breast cancer as non-users (a 100 percent increase).

77.    In the August 7, 2003 issue of *NEJM,* the WHI study continued to yield important information regarding the safety of hormone therapy use. The study found that combination hormone therapy does not protect the heart and may even increase the risk of coronary heart disease (CHD). Specifically, the WHI study found that combination hormone therapy usage was associated with a 24% overall increase in the risk of CHD (6 more heart attacks annually per 10,000 women using combination therapy) and an 81% increased risk of CHD in the first year after starting combination therapy.

78.    In addition to the studies published in *JAMA, NEJM,* and other medical journals, a federal agency report also revealed that estrogen could be dangerous to women taking it as hormone therapy. On December 11, 2002, the
National Institute of Environmental Health Sciences released its tenth annual report on carcinogens, which declared for the first time that estrogen is now on the federal government's list of "known human carcinogens."

79.    These studies necessarily took Wyeth by storm and it quickly changed its long term high dosage message. The new message, which asked doctors to place women on HRT for a short period at the lowest dose was a complete reversal of its decades-long marketing efforts that sought to keep post-menopausal women on hormone therapy long after their hot flashes and night sweats had past. The Wyeth Defendants had asserted that long-term use would prevent cardiovascular disease,

strengthen bones, and promote greater well being. Apparently, the Wyeth Defendants realized that their long-held slogan of "keep her on" hormone therapy was false and misleading.

80.     The Wyeth Defendants recklessly and willfully failed to conduct adequate pre-approval research and post-approval surveillance to establish the safety of the long-term hormone therapy regimen which was the cornerstone of its marketing strategy. In fact, it was only when the WHI and NCI studies were conducted—studies which the Wyeth Defendants could have and should have conducted themselves many years ago before embarking on their hormone campaign—that it was learned that hormone therapy causes cardiovascular diseases, is marginally effective in preventing bone loss, does not promote well being, causes a number of cancers and dementia, and is even harmful on a short-term basis, increasing the risk of breast cancer.

81.     Nevertheless, the Wyeth Defendants never disclosed on their warning labels that such testing had not been performed, thereby fraudulently inducing physicians and patients alike to use Wyeth's HRT products with the false assumption that such drugs had been sufficiently tested.

## Fraudulent Concealment

82.     Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts as alleged herein by the Wyeth Defendants.   Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on her part.

Plaintiff could not reasonably have discovered the dangerous nature of and unreasonable adverse side effects associated with Premarin, Prempro, Premphase, and medroxyprogesterone acetate prior to July 9, 2002, at the very earliest.

83.     The Wyeth Defendants are and were under a continuing duty to disclose the true character, quality, and nature of their hormone therapy drugs, including Premarin, Prempro, Premphase, and medroxyprogesterone acetate to women such as Plaintiff.   Because of their concealment of the true character, quality and nature of their hormone therapy drugs, the Wyeth Defendants are estopped from relying on any statute of limitations defense.

## FIRST CAUSE OF ACTION

### Negligence

84.     Plaintiff reincorporates and realleges, as if fully rewritten herein, paragraphs 1 through 83 as set forth above.

85.     Defendants had a duty to exercise reasonable care in the manufacture, sale, research, development, inspection, labeling, promoting, marketing and/or distribution of their HRT drugs, including Premarin, Prempro, Premphase, Provera,  and medroxyprogesterone acetate (also referred to as "the HRT drugs"), into the stream of commerce, including a duty to assure that these drugs did not cause users to suffer from unreasonable, dangerous side-effects.   Defendants failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control, marketing and/or distribution into interstate commerce of the Product, in that Defendants knew or should have known that this drug created a high risk of unreasonable, dangerous side-effects, some of which are fatal or can only be alleviated by major, invasive, life-threatening procedures.

86.     Defendants breached their duty of care to Plaintiff and her doctors and were negligent in the licensing, testing, design, manufacture, packaging, warning, advertising, promotion, distribution and a sale of the HRT drugs, in that Defendants:

A.      Failed to use ordinary care in designing and manufacturing the HRT drugs so as to avoid the aforementioned risks to individuals when they were being used to control menopausal symptoms;

B.      Failed to accompany the HRT drugs with proper warnings regarding the possible adverse side effects associated with the use of those drugs and the comparative severity and duration of such adverse effects, i.e., the warnings given did not accurately reflect the symptoms, scope or severity of the side effects;

C.      Failed to conduct adequate pre-clinical testing and post-marketing surveillance to determine the safety and side effects of the HRT drugs;

D.      Failed to provide adequate training to medical care providers for appropriate use of the HRT drugs;

E.      Failed to warn Plaintiff, directly or indirectly, orally or in writing, about the following:

(i)     The need for comprehensive, regular monitoring to ensure early discovery of potentially serious side effects like heart disease; and

(ii)    The possibility of becoming injured or disabled as a result of the HRT drugs' use and/or of having increased risks of breast cancer, heart disease, stroke, blood clots and gall bladder disease.

F.      Failed to adequately test and/or warn about the serious side effects of the HRT drugs;

G.      Failed to include adequate warnings with the HRT drugs that would alert consumers, physicians, hospitals, clinics, and other users to the potential risks and the nature, scope, severity, and duration of any serious side-effects of the HRT drugs;

H.    Continued to promote the efficacy and safety of the HRT drugs, while providing little or no warnings, and downplaying any risks, even after Defendants knew of the risks of serious injury and/or death;

I.    Delayed warnings of, and then failed to provide adequate warnings about the serious injuries and/or death, which may have dissuaded medical providers from prescribing the HRT drugs and depriving medical providers from weighing the true risks against the benefits of prescribing the HRT drugs; and

J.    Were otherwise careless or negligent.

87.    Although Defendants knew or should have known the HRT drugs caused unreasonably dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market these drugs to consumers, including Plaintiff and her doctors when there were safer alternative methods for the treatment of the normal symptoms associated with menopause.

88.    Defendants knew or should have known that consumers such as the Plaintiff would suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

89.    Plaintiff is entitled to punitive damages because Defendants' failure to warn was reckless and without regard for the public's safety and welfare. The Defendants misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety of their products. Defendants downplayed, understated, and disregarded their knowledge of the serious and permanent side effects associated with the use of HRT drugs despite available information demonstrating that their products were likely to cause serious and potentially fatal side effects to users such as Plaintiff.

90.    As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing and actions of the Defendants described herein, Plaintiff has been injured. Specifically the Plaintiff herein has endured breast cancer.

91.    Based upon information and belief, Defendants actually knew of the HRT drugs defective nature, as set forth herein, but continued to design, manufacture, market, and sell these

drugs so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious disregard of the foreseeable harm caused by these drugs.

92.     Defendants' conduct in the license, design, manufacturing, assembly, packaging, warning, marketing, advertising, promotion, distribution and sale of HRT drug products, including, but not limited to:

A.     Aggressively marketing and promoting HRT drugs, knowing the high risks posed by failing to conduct sufficient pre-clinical and clinical testing and adequate post-marketing surveillance;

B.     Failing to provide complete literature, instructions, and training to health care professionals indicating the proper use of the HRT drugs, and the need for monitoring patients while on them;

C.     Failing to include adequate warnings with the HRT drugs that would alert consumers, physicians, hospitals, clinics, and other users to the potential risks and the nature, scope, severity, and duration of any serious side-effects of the drugs, particularly, the risks of breast cancer, stroke, heart disease and/or death;

D.     Continuing to promote the efficacy and safety of these drugs, while providing little or no warnings, and downplaying any risks, even after Defendants knew of the increased risks associated with use of HRT drugs;

E.     Delaying warnings of, and then failing to provide adequate warnings about the dangerous side effects which may have dissuaded medical providers from prescribing HRT drugs so freely, and depriving medical providers from weighing the true risks against the benefits of prescribing these drugs, was fraudulent, knowing misconduct, and/or conduct undertaken recklessly and with conscious disregard for the safety of consumers such as the Plaintiff, such as to constitute despicable conduct, and oppression, fraud and malice, and such conduct was at all times relevant ratified by the corporate Defendants herein, thereby entitling Plaintiff punitive damages in an amount appropriate to punish and set an example of Defendants.

93.     As a result of Defendants' conduct, Plaintiff suffered injuries and damages as specified herein.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

A.      Compensatory damages in excess of $75,000.00 as provided by law and to be supported by evidence at trial;

B.      An award of attorney's fees, pre-judgment and post-judgment interred, and the costs of suit, as provided by law;

C.      Punitive damages, in an amount to be determined at trial; and,

D.      Such other legal and equitable relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### Fraud

94.     Plaintiff reincorporates and realleges, as if fully rewritten herein, paragraphs 1 through 93 as set forth above.

95.     The Wyeth Defendants, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote, and sell their hormone therapy drugs, including Premarin, Prempro, Premphase, Provera, and medroxyprogesterone acetate, owed a duty to provide accurate and complete information regarding these products.

96.     The Defendants' advertising program contained affirmative misrepresentations and omissions that falsely and deceptively sought to create the image and impression that the use of their hormone therapy drugs, including Premarin, Prempro, Premphase, Provera, and medroxyprogesterone acetate were safe for human use, had no unacceptable side effects, and would not interfere with daily life.

97.     The Defendants intentionally encouraged consumers and Plaintiff to remain on hormone therapy for a longer duration than they knew or should have known was safe and effective to remain on their drugs.

26

98.     On information and belief, Plaintiff avers that Defendants purposefully concealed, failed to disclose, misstated, downplayed, and understated the health hazards and risks associated with the use of hormone therapy. The Defendants, through promotional literature, deceived potential users and prescribers of the drugs by relaying only allegedly positive information, while concealing, misstating, and downplaying the known adverse and serious health effects. The Defendants falsely and deceptively kept relevant information from potential hormone therapy users and minimized prescriber concerns regarding the safety and efficacy of their drugs.

99.     Plaintiff justifiably relied to her detriment upon the Defendants' intentional misrepresentations concerning their hormone therapy drugs. In particular, in the materials disseminated by the Defendants, they falsely and deceptively misrepresented or omitted a number of material facts regarding their hormone replacement drugs, including Premarin, Prempro, Premphase, and medroxyprogesterone acetate, including, but not limited to, the following:

A.     The presence and adequacy of the testing of their hormone therapy drugs, both pre- and post-marketing; and

B.     The severity and frequency of adverse health effects caused by their hormone therapy drugs.

100.     Plaintiff is entitled to punitive damages because Defendants' failure to warn was reckless and without regard for the public's safety and welfare. The Defendants misled both the medical community and the public at large, including the Plaintiff, by making false representations about the safety of their hormone therapy drugs.

101.     The Defendants were or should have been in possession of evidence demonstrating that their product caused serious side effects. Nevertheless, they continued to market their products by providing false and misleading information with regard to its safety and efficacy.

102.     The Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of the Plaintiff and the public at large.

103.     As a result of the Defendants' conduct, Plaintiff suffered injuries and damages specified herein.

27

104.    Accordingly, Plaintiff seeks and is entitled to compensatory and punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

A.    Compensatory damages in excess of $75,000.00 as provided by law and to be supported by evidence at trial;

B.    An award of attorney's fees, prejudgment and post-judgment interred, and the costs of suit, as provided by law;

C.    Punitive damages, in an amount to be determined at trial; and,

D.    Such other legal and equitable relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION

### Strict Product Liability - Failure to Warn

105.    Plaintiff reincorporates and realleges, as if fully rewritten herein, paragraphs 1 through 1o4 as set forth above.

106.    Defendants are the manufacturer and/or supplier of the HRT drugs.

107.    The HRT drugs manufactured and/or supplied by Defendants were and are unaccompanied by proper warnings regarding all possible side effects associated with their use and the comparative severity, incidence, and duration of such adverse effects, i.e., the warnings given did not accurately reflect the signs, symptoms, incidence, scope or severity of the side effects including increased risks of breast cancer, heart disease, stroke, blood clots and gall bladder disease.

108.    Defendants failed to perform adequate testing that would have shown that the HRT drugs possessed serious potential side effects with respect to which full and proper warnings accurately and fully reflecting symptoms, scope and severity should have been made, both with respect to the use of this drug.

109.    The HRT drugs manufactured and/or supplied by Defendants were defective due to inadequate post-marketing warnings or instructions because, after the manufacturer knew or should

have known of the risks of injury from the HRT drugs, they failed to provide adequate warnings to users or consumers of the drugs and continued to aggressively promote the HRT drugs.

110.    As a direct, proximate and legal result of the negligence, carelessness, other wrongdoing and actions of Defendants described herein, the Plaintiff incurred injuries resulting from the use of the HRT drugs.  These injuries have caused extensive pain and suffering, emotional distress, and substantially reduce Plaintiff's ability to enjoy life.

111.    Based upon information and belief, Defendants actually knew of the HRT drugs defective nature, as set forth herein, but continued to design, manufacture, market, and sell the HRT drugs so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff, in conscious disregard of the foreseeable harm caused by the HRT drugs.

112.    Defendants' conduct in the license, design, manufacturing, assembly, packaging, warning, marketing, advertising, promotion, distribution and sale of the HRT drugs, including, but not limited to:

A.    Aggressively marketing and promoting HRT drugs, knowing the high risks posed by failing to conduct sufficient pre-clinical and clinical testing and adequate post-marketing surveillance;

B.    Failing to provide complete literature, instructions, and training to health care professionals indicating the proper use of the HRT drugs, and the need for monitoring patients while on them;

C.    Failing to include adequate warnings with the HRT drugs that would alert consumers, physicians, hospitals, clinics, and other users to the potential risks and the nature, scope, severity, and duration of any serious side-effects of the drugs, particularly, the risks of breast cancer, stroke, heart disease, blood clots, gall bladder disease and/or death;

D.    Continuing to promote the efficacy and safety of these drugs, while providing little or no warnings, and downplaying any risks, even after Defendants knew of the increased risks associated with use of HRT drugs;

29

E.  Delaying warnings of, and then failing to provide adequate warnings about the dangerous side effects which may have dissuaded medical providers from prescribing HRT drugs so freely, and depriving medical providers from weighing the true risks against the benefits of prescribing these drugs, was fraudulent, knowing misconduct, and/or conduct undertaken recklessly and with conscious disregard for the safety of consumers such as the Plaintiff, such as to constitute despicable conduct, and oppression, fraud and malice, and such conduct was at all times relevant ratified by the corporate Defendants herein, thereby entitling the Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendant.

113.  The Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of the Plaintiff and the public at large.

114.  As a result of the Defendants conduct, Plaintiff suffered the injuries and damages specified herein.

115.  Accordingly, Plaintiff seeks and is entitled to compensatory and punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

A.  Compensatory damages in excess of $75,000.00 as provided by law and to be supported by evidence at trial;

B.  An award of attorney's fees, pre-judgment and post-judgment interred, and the costs of suit, as provided by law;

C.  Punitive damages, in an amount to be determined at trial; and

D.  Such other legal and equitable relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

### Strict Product Liability - Defective Design/Manufacturing

116.  Plaintiff reincorporates and realleges, as if fully rewritten herein, paragraphs 1 through 115 as set forth above.

30

117.    Defendants are the manufacturer and/or supplier of the HRT drugs.

118.    The HRT drugs manufactured and/or supplied by Defendants were placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition in that the foreseeable risks exceeded the benefit associated with the design or formulation.

119.    Alternatively, the HRT drugs, as manufactured and/or supplied by Defendants, were defective in design or formulation in that when such drugs were placed in the stream of commerce, it was unreasonably dangerous, were more dangerous than an ordinary consumer would expect and more dangerous than other forms of treatment for normal symptoms associated with menopause.

120.    Based upon information and belief, Defendants actually knew of the HRT drugs defective nature but continued to design, manufacture, market and sell them so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm caused by the HRT drugs.

121.    As a direct, proximate and legal result of the negligence, carelessness, other wrongdoing and actions of Defendants described herein, Plaintiff incurred injuries resulting from the use of the HRT drugs. These injuries have caused extensive pain and suffering, emotional distress, and have substantially reduced Plaintiff's ability to enjoy life.

122.    Based upon information and belief, Defendants actually knew of the HRT drugs defective nature, as set forth herein, but continued to design, manufacture, market, and sell the HRT drugs so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious disregard of the foreseeable harm caused by the HRT drugs including increased risks of breast cancer, heart disease, stroke, blood clots and gall bladder disease.

123.    Defendants' conduct in the license, design, manufacturing, assembly, packaging, warning, marketing, advertising, promotion, distribution and sale of the HRT drugs, was wrongful, including, but not limited to:

A.    Marketing and promoting aggressively the HRT drugs, knowing the high risks posed by failing to conduct sufficient pre-clinical and clinical testing and adequate post-marketing surveillance;

31

B.  Failing to provide complete literature, instructions, and training to health care professionals indicating the proper use of the HRT drugs and the need for monitoring patients while on the HRT drugs;

C.  Failing to include adequate warnings with the HRT drugs that would alert consumers, physicians, hospitals, clinics, and other users to the potential risks and the nature, scope, severity, and duration of any serious side-effects of the HRT drugs, particularly, the risks of breast cancer, stroke, heart disease, blood clots, gall bladder disease and/or death;

D.  Continuing to promote the efficacy and safety of the HRT drugs while providing little or no warnings and downplaying any risks, even after Defendants knew of the increased risks associated with use of the HRT drugs; and

E.  Delaying warnings of and then failing to provide adequate warnings about the dangerous side effects which may have dissuaded medical providers from prescribing the HRT drugs so freely and depriving medical providers from weighing the true risks against the benefits of prescribing the HRT drugs, with fraudulent, knowing misconduct, and/or conduct undertaken recklessly and with conscious disregard for the safety of consumers, such as Plaintiff, such as to constitute despicable conduct, and oppression, fraud and malice, and such conduct was at all times relevant ratified by the Defendants herein, thereby entitling the Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

124.  The Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of the Plaintiff and the public at large.

125.  As a result of the Defendants' conduct, Plaintiff suffered the injuries and damages specified herein.

126.  Accordingly, Plaintiff seeks and is entitled to compensatory and punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

A.    Compensatory damages in excess of $75,000.00 as provided by law and to be supported by evidence at trial;

B.    An award of attorney's fees, pre-judgment and post-judgment interred, and the costs of suit, as provided by law;

C.    Punitive damages, in an amount to be determined at trial; and,

D.    Such other legal and equitable relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

### Breach of Express Warranty

127.    Plaintiff reincorporates and realleges, as if fully rewritten herein, paragraphs 1 through 126 as set forth above.

128.    Defendants, through description, affirmation of fact and promise relating to their HRT drugs, including Premarin, Prempro, Premphase, Provera, and medroxyprogesterone acetate, to the FDA, prescribing physicians, and the general public, including the Plaintiff, expressly warranted that the HRT drugs were safe and well-accepted by patient studies.

129.    These warranties came in the form of: (i) publicly-made written and verbal assurances of the safety and efficacy of hormone therapy drugs by the Defendants, (ii) press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create and increase demand for hormone therapy drugs, which utterly failed to warn of the risks inherent to the ingestion of hormone therapy; (iii) verbal assurances made by the Defendants regarding hormone therapy, and the downplaying of any risk associated with the drug; (iv) false and misleading written information, supplied by the Defendants, and published in the *Physicians Desk Reference* on an annual basis, upon which physicians were forced to rely in prescribing hormone therapy drugs during the period of Plaintiff's ingestion of hormone therapy drugs, including, but not limited to information relating the recommended duration of the use of the drugs; (v) promotional pamphlets and brochures published and distributed by the Defendants and directed to consumers; and (vi)

33

advertisements. The documents referred to in this paragraph were created by and at the direction of the Defendants and, therefore, are in their possession and control.

130.     At the time of these express warranties, the Defendants had knowledge of the purpose for which hormone therapy was to be used and warranted it to be in all aspects safe, effective, and proper for such purpose.

131.     The Defendants' drugs do not conform to these express representations in that they are neither safe nor effective and its use produces serious adverse side effects including increased risks of breast cancer, heart disease, stroke, blood clots and gall bladder disease.

132.     As such, the Defendants' products were neither in conformity to the promises, descriptions or affirmations of fact made about these drugs nor adequately contained, packaged, labeled or fit for the ordinary purposes for which such goods are used.

133.     The Defendants thereafter breached their express warranties to the Plaintiff in violation of the applicable provisions of the Uniform Commercial Code in each state by: (i) manufacturing, marketing, packaging, labeling, and selling hormone therapy to the Plaintiff and general public in such a way that misstated the risks of injury, without warning or disclosure thereof by package and label of such risks to the Plaintiff or the prescribing physician or pharmacist, or without so modifying or excluding such express warranties; (ii) manufacturing, marketing, packaging, labeling, and selling hormone therapy to Plaintiff and the general public, which failed to counteract the negative health effects of menopause in a safe and permanent manner and without injury; and (iii) manufacturing, marketing, packaging, labeling, and selling hormone therapy to Plaintiff and the general public, thereby causing the Plaintiff serious physical injury and pain and suffering.

134.     As a direct and proximate result, Plaintiff has suffered injuries as describe above. Specifically, Plaintiff has endured breast cancer.

135.     Plaintiff is entitled to punitive damages because the Defendants' failure to warn was reckless and without regard for the public's safety and welfare. The Defendants misled both the medical community and the public at large, including the Plaintiff, by making false representations

about the safety of their products. The Defendants downplayed, understated, and disregarded their knowledge of the serious and permanent side effects associated with the use of hormone therapy, despite available information demonstrating that it was likely to cause serious and sometimes fatal side effects to users.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

A. Compensatory damages in excess of $75,000.00 as provided by law and to be supported by evidence at trial;

B. An award of attorney's fees, pre-judgment and post-judgment interred, and the costs of suit, as provided by law;

C. Punitive damages, in an amount to be determined at trial; and,

D. Such other legal and equitable relief as this Court deems just and proper.

DATED: February 19, 2010

POGUST, BRASLOW & MILLROOD, LLC

By:

Derek T. Braslow, Esq. (PA ID # 78994)
Tobias L. Millrood, Esq. (PA ID # 77764)
Eight Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, PA 19428
Tel:    (610) 941-4204
Fax:    (610) 941-4245

Shawn Khorrami, Esq. (CA ID # 180411)
KHORRAMI POLLARD & ABIR LLP
444 South Flower Street, 33rd Floor
Los Angeles, CA 90071
Tel:    (213) 596-6000
Fax:    (213) 596-6010

Attorneys for Plaintiff

35

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all claims and causes of action in this action.

DATED:  February 19, 2010

POGUST, BRASLOW & MILLROOD, LLC

By:

Derek T. Braslow, Esq. (PA ID # 78994)
Tobias L. Millrood, Esq. (PA ID # 77764)
Eight Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, PA 19428
Tel:    (610) 941-4204
Fax:    (610) 941-4245

Shawn Khorrami, Esq. (CA ID # 180411)
KHORRAMI POLLARD & ABIR LLP
444 South Flower Street, 33rd Floor
Los Angeles, CA 90071
Tel:    (213) 596-6000
Fax:    (213) 596-6010

Attorneys for Plaintiff